[Cite as *Harrah's Ohio Acquisition Co., L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 2020-Ohio-4214.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

HARRAH'S OHIO ACQUISITION
COMPANY, L.L.C., ET AL.,                    :

     Plaintiffs-Appellees,                :
                                  No. 108765

     v.                                      :

CUYAHOGA COUNTY BOARD OF
REVISION, ET AL.,                           :

     Defendants-Appellants.               :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 27, 2020

---

Civil Appeal from the Ohio Board of Tax Appeals
Case Nos. 2014-4596, 2014-4810, 2014-4818, and 2014-4896

---

### *Appearances:*

Paul M. Jones, Jr., *for appellee* Harrah's Ohio Acquisition
Company, L.L.C.

The Law Office of Thomas A. Kondzer, L.L.C., Thomas A.
Kondzer, and Joseph A. Volpe, *for appellant* Warrensville
Heights City School District Board of Education.

LARRY A. JONES, SR., J.:

{¶ 1} In this appeal, defendant-appellant, Warrensville Heights City School

District Board of Education ("BOE"), challenges the June 7, 2019 decision of the

Ohio Board of Tax Appeals ("BTA") regarding the value of certain property for the tax year 2013, which is set forth in *Harrah's Ohio Acquisition Co., L.L.C. v. Cuyahoga Cty. Bd. of Revision*, BTA Nos. 2014-4596, 2014-4810, 2014-4818, and 2014-4896, 2019 Ohio Tax LEXIS 1278 (June 7, 2019).  Specifically, the BTA found the property's value for the tax year 2013 was $21.5 million.  For the reasons that follow, we affirm.

### Procedural and Factual History

{¶ 2}  The property at issue in this case consists of two parcels located in Warrensville Heights, which collectively comprise a 128-acre horse-racing facility with a track, an eight-story grandstand, barns, and other structures.  In July 2010, the property was purchased by plaintiff-appellee Harrah's Ohio Acquisition Company, L.L.C. ("Harrah's") for $43 million.  According to Harrah's, between January 1, 2012 and January 1, 2013, it spent approximately $7 million on improvements to the property.  Shortly after the tax lien date, it obtained a video lottery terminal ("VLT") license; the license cost $50 million.  In April 2013, Harrah's began operating as Thistledown Racino.

{¶ 3}  The Cuyahoga County fiscal officer valued the property at $37,658,000 for the tax year 2013.  Both Harrah's and the BOE filed complaints with the Cuyahoga County Board of Revision ("BOR") seeking changes in that valuation.[1]  Harrah's sought a decrease in value to $23,315,888 (the fiscal officer's

---

[1]The fiscal officer valued the property at $16.3 million for the tax year 2012.  That valuation was affirmed by the Ohio Supreme Court.  *Warrensville Hts. City School Dist.*

2012 valuation plus the improvements), and the BOE sought an increase in value to $43 million (the 2010 purchase price).

**{¶ 4}** The BOR held a hearing on the complaints. Harrah's relied on the 2012 valuation, testimony from its chief financial officer Amy Kuzdowicz, CPA, and an appraisal by David Sangree ("Sangree"). The BOE continued to rely on the 2010 purchase price and objected to Sangree's appraisal. After consideration of the testimony and evidence, the BOR declined to make a change to the property's valuation. Harrah's and the BOE both appealed to the BTA and a hearing was held.

**{¶ 5}** Harrah's presented Sangree's report and testimony. In his report, Sangree utilized three approaches to value the property: an income-capitalization approach, a sales-comparison approach, and a cost approach. Sangree testified that he believed the value of the property as of January 1, 2013, was $22 million. In reaching his opinion, Sangree relied primarily on his income-capitalization and sales approaches.

**{¶ 6}** Under his income-capitalization approach, Sangree valued the entire real property. Thus, because he only used the value of the real property, Sangree deducted the value attributable to property other than real property, which meant he deducted the value of the VLT license ($50 million), the value of personal

---

*Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 152 Ohio St.3d 277, 2017-Ohio-8845, 95 N.E.3d 359.

In a prior appeal about this property to the Ohio Supreme Court, the court affirmed the BTA's decision valuing the property at $13.8 million for the tax year 2010; the value was based on an appraisal submitted by Harrah's. *Warrensville Hts. City School Dist. Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 145 Ohio St.3d 115, 2016-Ohio-78, 47 N.E.3d 144.

property ($30.7 million), and about $4.5 million, to account for the fact that the racino did not begin operating until April 2013. Sangree's valuation for the tax year 2013 under the income-capitalization approach was $21.5 million.

**{¶ 7}** Under his sales-comparison approach, Sangree used four sales of what he deemed comparable properties; the sales occurred between August 2003 and October 2010. He then made quantitative adjustments to the sales to come up with an adjusted range. Sangree reconciled the three approaches he utilized, giving, as mentioned, primary weight to the income-capitalization and sales approaches, to arrive at a final valuation of $22 million for the 2013 tax year.

**{¶ 8}** The BOE presented the appraisal report and testimony of Douglas Bovard ("Bovard"); Bovard testified that the value of the property as of January 1, 2013, was $44.5 million. Bovard reached his opinion by also relying on an income-capitalization approach. But unlike Sangree's income-capitalization approach, Bovard assumed that the property would be leased to a racino operator at market rent, and assumed that a typical lease of this type would call for a percentage rate of a racino's "wagering handle." Because there was a scarcity of racetrack and casino leases, Bovard analyzed racetrack-property leases from 1986 to 1996 to estimate what those percentages would be. Those percentages included live on-track wagering handle, wagering handle from Thistledown races that are simulcast to other betting facilities, wagering handle for races simulcast to Thistledown, and net revenue from VLTs.

{¶ 9} Bovard also determined the value of the property under a cost approach and a discounted-cash flow ("DCF") approach. He testified that he used these approaches as a "check" on his conclusion under his income-capitalization approach that the property's 2013 value was $44.5 million.

{¶ 10} In contrast, however, Sangree testified that he did not believe that casinos are commonly leased and that he was not aware of any leases in Ohio involving a racino property. Thus, he believed that his method — rather than Bovard's lease-value method — was the best one to determine the value of the property.

{¶ 11} The BTA issued its conclusion in a March 17, 2016 decision. *Harrah's Ohio Acquisition Co., L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 2016 Ohio Tax LEXIS 585 (Mar. 17, 2016). It found the income-capitalization approach to be the most accurate way to determine the value of the property. The BTA noted the differences between Sangree's and Bovard's methodologies under the approach. It noted that Bovard had hypothesized the conditions under which a landlord might lease the property, and concluded that he had determined a "leased-fee value." *Id.* at 6. According to the BTA, Bovard's leased-fee value "'taint[ed] the validity of [his] entire report.'" *Id.*, quoting *JGT Ents., Inc., v. Logan Cty. Bd. of Revision*, BTA No. 00-A-890, 2002 Ohio Tax LEXIS 393, 7-8 (Mar. 8, 2002). Thus, the BTA declined to consider Bovard's conclusions as to the value of the property, and adopted Sangree's $22 million valuation. The BOE appealed to the Ohio Supreme Court. *Harrah's*

*Ohio Acquisition Co., L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 154 Ohio St.3d 340, 2018-Ohio-4370, 114 N.E.3d 192.

{¶ 12} In its first proposition of law, the BOE contended that Sangree's appraisal contained numerous flaws but, in contrast, Bovard's appraisal was legally sound and more reliable. The Ohio Supreme Court held that the BTA's refusal to consider Bovard's appraisal was legal error because the appraiser could take the possibility of encumbering the property with a lease into account when valuing it consistent with R.C. 5713.03's directive to determine the "'true value of the fee simple estate, as if unencumbered,'" so long as the appraisal assumed a lease that reflected the relevant real estate market. *Id.* at ¶ 27, quoting Appraisal Institute, *The Appraisal of Real Estate*, 441 (14th Ed.2013).

{¶ 13} The court noted that "[a]lthough the BTA ultimately may disagree with Bovard's factual assumptions about the lease terms, his methodology was not defective as a matter of law, and the BTA should have considered it." *Id.* The court further noted that the BTA failed to consider the "perceived strengths and weaknesses of Bovard's appraisal." *Id.* at ¶ 28. "Because the BTA did not consider those questions or weigh Bovard's appraisal against the other evidence in any meaningful way, we vacate the BTA's decision and remand the case for the BTA to fully consider and address the evidence." *Id.*

**{¶ 14}** On remand, the BTA issued the June 7, 2019 decision from which the BOE now appeals.[2]

### Assignments of Error and Issues for Review

**{¶ 15}** The BOE assigns the following 12 assignments of error for our review:

I. The Board of Tax Appeals acted contrary to Ohio law, acted unreasonably, abused its discretion and made factual findings without evidentiary support in the record, committed reversible error, abused its discretion, and acted contrary to Ohio law when it concluded that the appraisal report and income capitalization approach utilized by the board of education's appraisers, Mr. Douglas F. Bovard and Mr. Daniel L. McCown, MAI, reflected "business value" and, therefore, reflected the "business value" and not the "realty value" of the subject property and then rejected the appraisers' value in its entirety.

II. The Board of Tax Appeals acted contrary to Ohio law, acted unreasonably, abused its discretion and made factual findings without evidentiary support in the record when it held, contrary to established appraisal practice and the reality of the gaming industry, that the income capitalization approach utilized by the board of education's appraisers valued not only the real estate value of the subject property but also included a business value.

III. The Board of Tax Appeals acted contrary to Ohio law, acted unreasonably, abused its discretion and made factual findings without evidentiary support in the record when it determined, contrary to the appraisal evidence that was presented by both the property owner and the board of education, that "no weight" should be given to the cost approach of valuation used by both appraisers.

IV. The Board of Tax Appeals acted contrary to Ohio law, acted unreasonably, abused its discretion and made factual findings

---

[2]The BTA did not have another hearing on remand; rather, it issued its decision after considering the "notices of appeal, the statutory transcripts certified pursuant to R.C. 5717.01, the record of this board's hearing * * *, the parties' written arguments, and the court's decision." *Harrah's Ohio Acquisition Co., L.L.C. v.*, 2019 Ohio Tax LEXIS 1278 at 1-2.

without evidentiary support in the record when it determined that "no weight" should be given to the cost approach, but did not explain the basis for this particular determination.

V.    The Board of Tax Appeals acted contrary to Ohio law, acted unreasonably, abused its discretion and made factual findings without evidentiary support in the record when it valued the subject real estate on the basis of the property owner's appraisal, which was not an appraisal of the fee simple interest in the real estate but instead was an appraisal of the business activity that was conducted on the real estate.

VI.    Contrary to its obligations under Ohio law to explain the basis for its findings, the Board of Tax Appeals committed reversible error when it valued the Thistledown real estate on the basis of the property owner's appraisal evidence but utterly failed to explain the basis for its decision to ignore the fundamental flaws in the property owner's appraisal, including but not limited to the following: a.) the appraiser's valuation of the Thistledown business rather than the Thistledown real estate; b.) the appraiser's reliance on erroneous acreage information in its comparable land sales, which then resulted in erroneous values, all of which shows a lack of reliability and credibility in the report; c.) the appraiser's use of an improper capitalization rate; and d.) the appraiser's reliance on a series of improper and unsupported deductions which the appraiser made from the business value of the entity to arrive at his value of the real estate.

VII.    The Board of Tax Appeals acted contrary to Ohio law, acted unreasonably, abused its discretion and made factual findings without evidentiary support in the record when it when it failed to recognize or even consider the steps that were undertaken by the board of education's appraisers to exclude business value from their valuation of the Thistledown real estate.

VIII.    The Board of Tax Appeals acted contrary to Ohio law, acted unreasonably, abused its discretion and made factual findings without evidentiary support in the record when it valued the subject real estate on the basis of the property owner's appraisal, which valued the business, not the real estate, assuming that on January 1, 2013 the property was used for the operation of video lottery terminals when in fact video lottery terminals were not operating on the property until April of 2013. The Board of Tax Appeals, without any evidentiary support, then compounded its

error by accepting unsupported deductions for the value of the video lottery license, in spite of the fact that a video lottery license was not issued until April of 2013.

IX.     The Board of Tax Appeals committed reversible error, abused its discretion, and acted contrary to Ohio law when it issued an internally inconsistent opinion. The Board of Tax Appeals stated that it was valuing the property based on the opinion of value of the property owner's appraiser, which value was $21,500,000.00. However, earlier in the opinion, the Board of Tax Appeals stated that the opinion of value of the property owner's appraiser was $22,000,000.00. The Board of Tax Appeals never explained this internal inconsistency.

X.      Contrary to its obligations under Ohio law to explain the basis for its findings, the Board of Tax Appeals committed reversible error in failing to explain the basis for its decision to accept the appraisal report of the property owner.

XI.     In its second and most recent decision in this matter, following remand from the Ohio Supreme Court, the Board of Tax Appeals committed reversible error, abused its discretion, and acted contrary to Ohio law when it disregarded the Ohio Supreme Court's clear remand instructions from *Harrah's Ohio Acquisition Company, LLC v. Cuyahoga Cty. Bd. of Rev.*, 2018-Ohio-4370, and failed to give consideration to the board of education's appraisal.

XII.    The Board of Tax Appeals acted contrary to Ohio law, acted unreasonably, abused its discretion and made factual findings without evidentiary support in the record when it failed to consider and weigh the board of education's appraisal testimony against the property owner's appraisal testimony and other evidence in this case in any "meaningful way," as directed by the Ohio Supreme Court in its remand of this case to the Board of Tax Appeals in the case of *Harrah's Ohio Acquisition Company, LLC v. Cuyahoga Cty. Bd. of Rev.*, 2018-Ohio-4370.

{¶ 16} The parties have addressed these assignments of error under the umbrella of the following three larger issues:

I. The second and most recent June 7, 2019 decision of the board of tax appeals regarding the value of the subject property for tax year 2013 should be vacated by this honorable Court, since the board's decision is, once again, based on an incorrect legal conclusion, and, in particular, the board's decision is directly contrary to the clear holding and remand instructions that were issued by the Ohio Supreme Court in *Harrah's Ohio Acquisition Company, LLC v. Cuyahoga Cty. Bd. of Rev.*, 154 Ohio St.3d 340, 2018-Ohio-4370.[3]

II. Given that the board of tax appeals has again failed to fully consider and address the board of education's appraisal evidence in its June 7, 2019 decision on the basis of the BTA's erroneous legal conclusion regarding the board of education's appraisal, the board of education submits that this honorable court should consider the weaknesses and strengths of both appraisals and then utilize the more credible and reliable evidence of the board of education in order to set the value of the property for tax year 2013. In the alternative, should this honorable court elect not to consider the two appraisals and utilize the most credible and reliable evidence of record in order to set the value of the property, then the board of education submits that this honorable court should vacate the June 7, 2019 decision of the board of tax appeals and again remand the matter to the board with instructions for the board to fully consider and address all of the appraisal evidence submitted in this case.[4]

III. In the event that this honorable court decides not to consider and utilize the most credible and reliable evidence of record in order to set the value of the subject property for tax year 2013, this honorable court should, at a minimum, reverse and remand the BTA's June 7, 2019 decision with instructions for the BTA not only to fully address all of the record evidence but to adequately explain the basis for its findings.[5]

**Law and Analysis**

---

[3]This issue corresponds to assignments of error nos. 1, 2, 11, and 12.
[4]This issue corresponds to assignments of error nos. 5, 6, 7, and 8.
[5]This issue corresponds to assignments of error nos. 3, 4, 6, 9, and 10.

{¶ 17} As mentioned, in its first March 17, 2016 decision in this case, the BTA summarily dismissed Bovard's appraisal because it believed that his leased-fee approach "overstated the total value of the property." *Harrah's Ohio Acquisition Co., L.L.C.*, 2016 Ohio Tax LEXIS 585, at 18. Specifically, the BTA found that because the appraisal failed to value the fee simple estate, it "'taint[ed] the validity of the entire report.'" *Id.*, quoting *JGT Ents., Inc.*, 2002 Ohio Tax LEXIS 393. Relying on its decision in *Meijer Stores Ltd. Partnership v. Franklin Cty. Bd. of Revision*, 122 Ohio St.3d 447, 2009-Ohio-3479, 912 N.E.2d 560, the Ohio Supreme Court remanded for the BTA's consideration of Bovard's appraisal.[6]

{¶ 18} In reviewing the BTA's June 7, 2019 decision, our inquiry is limited under the Ohio Supreme Court's decision in *Harrah's Ohio Acquisition*, 154 Ohio St.3d 340, 2018-Ohio-4370, 114 N.E.3d 192, to whether the BTA, on remand, considered and weighed Bovard's appraisal "against the other evidence in any meaningful way[.]" *Id.* at ¶ 28.

## Standard of Review

{¶ 19} An appellate court reviews a decision of the BTA to determine whether it is reasonable and lawful. R.C. 5717.04; *HIN, L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 124 Ohio St.3d 481, 2010-Ohio-687, 923 N.E.2d 1144, ¶ 13; *Cousino Constr. Co. v. Wilkins*, 108 Ohio St.3d 90, 2006-Ohio-162, 840 N.E.2d 1065, ¶ 10. "It is well settled that [an appellate] court will defer to factual determinations of the

---

[6]In *Meijer*, the court recognized that property owners may be able to realize the value of their property by encumbering it with a lease, and an appraiser may take that possibility into account when valuing it. *Id.* at ¶ 23.

BTA if the record contains reliable and probative support for them." *Strongsville Bd. of Edn. v. Wilkins*, 108 Ohio St.3d 115, 2006-Ohio-248, 841 N.E.2d 303, ¶ 7; *Am. Natl. Can Co. v. Tracy*, 72 Ohio St.3d 150, 152, 648 N.E.2d 483 (1995).

**BTA's June 7, 2019 Decision**

{¶ 20} In its decision issued after the Supreme Court remand, the BTA considered Bovard's previous testimony in determining a lease-rate valuation for the property. Bovard explained that his "research into actual leases of pari-mutuel racetrack facilities * * * indicates that rentals for such facilities are generally based upon a percentage of the wagering handle from" live races, simulcast races, and VLT revenue.[7] Bovard admitted that there were not a lot of racetrack and casino leases, so he had to utilize pari-mutuel racetrack leases with lease periods from March 1984 through September 1996; the leases were for properties located in Illinois, Pennsylvania, California, Oregon, and Iowa. Bovard also relied on two confidential off-track-wagering-facility leases from 1990 and 1992.

{¶ 21} Based on the above data, Bovard estimated the percentage applicable for each type of revenue. He estimated the wagering handles for the subject property and a 1 percent management-fee expense. He determined a 10 percent discount rate

---

[7]"Pari-mutuel betting is the most common form of horse-racing betting. Rather than placing a bet against the race track, like one would with a bookie, horse racing bettors are wagering against each other. A horse racing track takes a minimal commission from all wagers as a fee for handling horse racing bets. It does not collect anything else when a bettor loses." https://www.thesportsgeek.com/sports-betting/horse-racing/pari-mutuel-betting/(Accessed July 17, 2020).

based on the Korpacz net-lease-market survey[8] and the Realtyrates.com land-lease-market survey, a residual-capitalization rate of 8 percent based on the same sources, and a 2 percent cost-of-residual sale. Applying his estimates in a DCF analysis, Bovard arrived at a value of $47.8 million for the real property as of January 1, 2014. He also performed a direct-capitalization analysis on his estimated net operating income, using an 8 percent capitalization rate, to arrive at a value of $48.5 million as of January 1, 2014. To derive a value under the income approach as of tax lien date (January 1, 2013), Bovard changed the first-year income in his DCF analysis to account for the fact that VLTs were not operating until April 2013. The change resulted in a value of $44.7 million. Further, Bovard capitalized the second-year net operating income from his DCF analysis at 8 percent and discounted the value-to-present worth, to determine a value of $44.2 million under the capitalization approach as of January 1, 2013. Bovard ultimately determined the value of the property as of January 1, 2013, was $44.5 million.[9]

{¶ 22} The BTA considered Sangree's valuation, which, as mentioned, relied mainly on an income-capitalization approach. It noted that many of the BOE's criticisms of Sangree's approach were rejected by the Ohio Supreme Court in *Harrah's Ohio Acquisition*, 154 Ohio St.3d 340, 2018-Ohio-4370, 114 N.E.3d 192.[10]

---

[8]The Korpacz net-lease-market survey is a commercial data reference publication relative to market, income, and capitalization rates.

[9]Additionally, Bovard completed a cost-approach-to-value that indicated a value of $48 million. He did not complete a sales-comparison approach for the property as improved.
[10]The BTA noted, for example, that the court rejected the BOE's contention that it was contrary to law to attribute a separate value to Harrah's opportunity to acquire racing and

After reviewing Sangree's report and testimony, the BTA concluded that his income-capitalization approach produced the best value of the property. Specifically, the BTA held that, "[u]pon review of Mr. Sangree's income approach and related testimony, we find his opinion of value of [$21.5 million] as of January 1, 2013 is reasonable, well supported, and the best evidence of the property's value as of the tax lien date." In finding Sangree's valuation more credible and reliable than Bovard's valuation, the BTA noted that Bovard's valuation ran "afoul" of a problem the court had addressed in a then-recent case, *HCP EMOH, L.L.C. v. Washington Cty. Bd. of Revision*, 155 Ohio St.3d 378, 2018-Ohio-4750, 121 N.E.3d 370, which will be discussed below.

**First Issue**

{¶ 23} Under the first issue, the BOE contends that the BTA's June 7, 2019 decision should be vacated because the BTA once again relied on an incorrect legal conclusion, in conflict with the Ohio Supreme Court's remand instructions in *Harrah's Ohio Acquisition*. Upon review, we disagree.

{¶ 24} The Ohio Supreme Court's mandate was for the BTA to give consideration to Bovard's approach. We find that it did. Ultimately, however, it rejected Bovard's approach, and adopted Sangree's approach; but it gave Bovard's approach the consideration the Ohio Supreme Court mandated.

---

VLT licenses or that it was contrary to law to deduct the value of VLT license. *Harrah's Ohio Acquisition*, 154 Ohio St.3d 340, 2018-Ohio-4370, 114 N.E.3d 192, at ¶ 17, 24. The BTA also noted that the court did not find any error in the BTA's assessment of the overall reliability and credibility of Sangree's report. *Id.* at ¶ 25.

{¶ 25} In its decision on remand, the BTA detailed what it believed to be Bovard's flawed approach. Specifically, the BTA found Bovard's analysis of 1984 to 1996 leases from pari-mutuel racetracks in Illinois, Pennsylvania, California, Iowa, and Oregon to be a flawed basis on which to establish a hypothetical lease rate for the property at issue here. The BTA relied on the Ohio Supreme Court's decision in *HCP*.

{¶ 26} In *HCP*, 155 Ohio St.3d 378, 2018-Ohio-4750, 121 N.E.3d 370, the court considered the legality of appraising property based on a lease rate derived from the income generated by the business operating on the property. The property at issue in *HCP* was an assisted-living facility, and the appraiser used a "leases-coverage analysis" to isolate the cash flow attributed only to the realty of the property. The lease-coverage ratio was derived from the net operating income of the going concern of the business. The court found the approach to be legally flawed because the appraiser did not adequately isolate the income attributable to the real property. *See id.* at ¶ 7-10. In so finding, the *HCP* court cited its decision in *Higbee Co. v. Cuyahoga Cty. Bd. of Revision*, 107 Ohio St.3d 325, 2006-Ohio-2, 839 N.E.2d 385.

{¶ 27} In *Higbee*, a city and its board of education sought review of the BTA's valuation of retail property. In resolving the valuation issue, the *Higbee* court stated the following principle:

If it is the real property that is being valued, its valuation cannot be

made to vary depending on the success or lack thereof of the businesses located on the property. Admittedly, the location of a property may influence the sales made by a merchant at that property. However, the merchant's business practices may also influence sales. The business factors and the real-property factors must be separated when the real property is being valued for tax purposes. How the business factors and the real-property factors are separated in valuing real property is a matter of proof.

*Id.* at ¶ 44.

{¶ 28} Based on *HCP* and *Higbee*, the BTA found Bovard's valuation invalid because the "lease rate he derived is based on a percentage of the various types of revenue from the business conducted at the subject property." *Harrah's Ohio Acquisition Co., L.L.C.*, 2019 Ohio Tax LEXIS 1278, at 12. In contrast, the BTA found Sangree's income approach, which deducted non-realty items, to be the more reliable and probative valuation of the property.

{¶ 29} The BOE contends that the BTA ignored the Ohio Supreme Court's remand instructions by applying *HCP* in its June 2019 decision. According to the BOE, the BTA assumed that *HCP* overruled the Ohio Supreme Court's decision in *Harrah's Ohio Acquisition*, 154 Ohio St.3d 340, 2018-Ohio-4370, 114 N.E.3d 192, and if the court in *Harrah's Ohio Acquisition*, *supra*, thought that *HCP* and *Higbee* applied to this case, it would have applied it, which it did not; thus, those cases are irrelevant to the BTA's consideration of Bovard's income approach. We disagree.

{¶ 30} The conclusion regarding Bovard's approach that the Ohio Supreme Court reached in *Harrah's Ohio Acquisition* was not as to the merits of his approach; rather, the court concluded that the BTA committed legal error by wholly

disregarding Bovard's income approach. Thus, because the court did not consider the merits of Bovard's approach, there was no need to discuss *HCP* and *Higbee.*

{¶ 31} *HCP* and *Higbee* provided the BTA with insight in fulfilling the Supreme Court's directive on remand, which was to fully consider Bovard's approach. The BTA found that those cases demonstrated the flaw in Bovard's valuation; that is, his valuation would vary depending on the success or lack thereof of the business, rather than establishing a lease rate that reflected realty value.

{¶ 32} Moreover, the Supreme Court's decision in *Harrah's Ohio Acquisition* did not require the BTA to accept all the assumptions of Bovard's approach as reliable. Rather, the court specifically stated that the "BTA ultimately may disagree with Bovard's factual assumptions about the lease terms." *Id.* at ¶ 27-28. The Supreme Court's reference to *Meijer*, 122 Ohio St.3d 447, 2009-Ohio-3479, 912 N.E.2d 560, in *Harrah's Ohio Acquisition*, does not, as the BOE contends, stand for a wholesale endorsement of Bovard's methodology. As mentioned, *Meijer* stands for the general proposition that property owners may be able to realize the value of their property by encumbering it with a lease, and an appraiser may take that possibility into account when valuing it. *See* fn. 6, *infra*, citing *Meijer* at ¶ 23. But notably, *Meijer* did not involve a percentage-rent approach to establish a lease rate.

{¶ 33} We are not persuaded by the BOE's reliance on *Saratoga Harness Racing, Inc. v. Williams*, 91 N.Y.2d 639, 697 N.E.2d 164 (1998), or *Northfield Park Assoc. v. Summit Cty. Bd. of Revision*, BTA No. 86-A-277 (Jan. 25, 1991). *Saratoga*

is a New York case that has no binding authority here. *Northfield Park Assoc.*, a BTA decision, similarly is not binding on this court; moreover, it is a 29-year-old decision.

{¶ 34} Further, we are not persuaded by the BOE's contention that the Ohio Supreme Court endorsed Bovard's methodology in its entirety. As stated, the court found that using the income-approach-to-value, owner-occupied real estate is a valid methodology. But the court was silent on whether market rents Bovard used would be the appropriate rental rates under his approach. Thus, the court did not "align its endorsement of Bovard's methodology as a matter of law," as the BOE contends.

{¶ 35} Thus, in light of the above, and upon review, we find that the BTA fulfilled the Ohio Supreme Court's mandate. Unlike in its 2016 decision, which summarily dismissed Bovard's report, the 2019 decision considered Bovard's approach in a meaningful manner; it considered both his report, his testimony, and case law regarding valuation. However, after weighing it against the other evidence (i.e., Sangree's valuation method), the BTA found that Bovard's approach was not reliable. The BTA fulfilled the mandate, and we decline to disturb its judgment: the BTA is "vested with wide discretion in determining the weight to be given to the evidence and the credibility of the witnesses that come before it." *NWD 300 Spring, L.L.C. v. Franklin Cty. Bd. of Revision*, 151 Ohio St.3d 193, 2017-Ohio-7579, 87 N.E.3d 199, ¶ 13, quoting *EOP-BP Tower, L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, ¶ 9.

{¶ 36} Accordingly, we find no merit to the first issue and, therefore, overrule the first, second, eleventh, and twelfth assignments of error.

**Second and Third Issues**

{¶ 37} Under its second issue for our review, the BOE requests that we "consider the weaknesses and strengths of both appraisals and then utilize the more credible and reliable evidence of the board of education in order to set the value of the property for tax year 2013." Alternatively, under both the second and third issues, the BOE requests that we vacate the June 7, 2019 decision and remand the case "with instructions for the board to fully consider and address all of the appraisal evidence submitted in this case [and] to adequately explain the basis for its findings."

{¶ 38} Under these issues, the BOE is asking us to decide issues of fact, weigh the reliability of the evidence, and weigh the credibility of the testimony. Specifically, the BOE asks us to address the following: (1) Sangree's downward adjustments in his sales-comparison approach for the value of racing and potential VLT licenses; (2) Sangree's deduction for the value of the VLT license from the market value of the going concern; and (3) the reliability and credibility of Sangree's report. All these issues were addressed by the Ohio Supreme Court in *Harrah's Ohio Acquisition*, 154 Ohio St.3d 340, 2018-Ohio-4370, 114 N.E.3d 192, and they were not subject to the Ohio Supreme Court's remand order.[11] Specifically, the court's

---

[11] *See Harrah's Ohio Acquisition* at ¶ 17 regarding the first issue (It was proper for Sangree to "attribute separate value to a property owner's opportunity to acquire racing and VLT licenses."); *id.* at ¶ 24 regarding the second issue (Sangree's deduction for the value of the

mandate was for the BTA to fully consider and address Bovard's valuation. As mentioned, we are bound by the BTA's determinations if the record contains reliable and probative support for them. *Strongsville Bd. of Edn.*, 108 Ohio St.3d 115, 2006-Ohio-248, 841 N.E.2d 303, at ¶ 7; *Am. Natl. Can Co.*, 72 Ohio St.3d 150 at 152, 648 N.E.2d 483. We find that the record here contains reliable and probative support for the BTA's determination.

{¶ 39} In light of the above, we find no merit to the second issue and, therefore, overrule the fifth, seventh, and eighth assignments of error; and the sixth assignment of error in part.

{¶ 40} In regard to the third issue, the BOE asks us to reverse the BTA's June 7, 2019 decision on the authority of *Cleveland Pub. Library v. Cuyahoga Cty. Budget Comm.*, 28 Ohio St.3d 390, 504 N.E.2d 421 (1986). Again, we decline to do so. In *Cleveland Pub. Library*, the appellants were public libraries that sought review of a decision by the BTA ordering the allocation of certain classified property tax funds among the appellants and appellees, which consisted of other public libraries. The court found that the BTA did not offer factual findings on which to base its allocation of the funds. Thus, because of the BTA's failure to set forth its basis of determination with any degree of specificity, the court found it impossible

---

VLT license was reasonable because the VLT license is nonreal property that has value as part of the going concern.); and *id.* at ¶ 25 regarding the third issue (rejecting BOE's "invitation to interfere with the BTA's discretion in assessing these details of Sangree's appraisal").

to review the BTA's decision for reasonableness or lawfulness. That is not the case here.

{¶ 41} As already discussed, on remand, the BTA considered Bovard's approach as it was mandated to do, and gave specific reasoning as to why it did not find it reliable. We will not second-guess the decision, or substitute our judgment for the decision. Further, there is no need to remand for further proceedings; the BTA fulfilled the Ohio Supreme Court's mandate.

{¶ 42} In light of the above, the third issue is without merit and, therefore, the third, fourth, ninth, and tenth assignments of error are overruled; and the remaining portion of the sixth assignment of error is overruled.

{¶ 43} Having overruled all assignments, the June 7, 2019 decision of the BTA is affirmed in all respects.

{¶ 44} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Ohio Board of Tax Appeals to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., JUDGE

MARY J. BOYLE, P.J., and
EILEEN A. GALLAGHER, J., CONCUR